IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 7, 2011

**STATE OF TENNESSEE v. JOSEPH BERNETTE DRIVER**

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2010-A-498    J. Randall Wyatt, Jr., Judge**

**No. M2011-00536-CCA-R3-CD - Filed August 31, 2012**

A Davidson County jury convicted the Defendant, Joseph Bernette Driver, of facilitation of aggravated robbery and evading arrest. The trial court sentenced the Defendant, a Range I standard offender, to six years for the facilitation of aggravated robbery conviction and a concurrent term of eleven months and twenty-nine days for the evading arrest conviction. On appeal, the Defendant contends that: (1) the trial court erred in denying his motion to suppress the show-up identification; (2) the evidence is insufficient to support his conviction for facilitation of aggravated robbery; and (3) the trial court erred by imposing the maximum sentence for the conviction of facilitation of aggravated robbery. After a thorough review of the record and relevant authorities, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and D. KELLY THOMAS, JR., JJ., joined.

Jeffrey A. DeVasher (on appeal) and Jonathan F. Wing and Tyler Chance Yarbro (at trial), Nashville, Tennessee, for the appellant, Joseph Bernette Driver.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Ben Ford and Allen Grant, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I. Facts**
**A. Suppression Hearing**

A Davidson County Grand Jury indicted the Defendant for aggravated robbery and evading arrest. The Defendant filed a motion to suppress the testimony from Jonathan Colvin, regarding an identification he made of the Defendant during a show-up identification procedure on November 17, 2009, at the scene of a crime committed earlier on the same day. At the motion hearing, the parties presented the following proof:

Detective Byron Agoston, a detective with the Metro Nashville Police Department, testified he conducted general surveillance on Gallatin Road in the Madison area on November 17, 2009. At approximately 2:00 a.m., he observed the Defendant standing outside a Mapco convenience store located at the corner of Gallatin Pike and Due West Avenue. Detective Agoston noticed the Defendant because it had started to rain and the Defendant was standing on the side of the building that was not covered. Detective Agoston "set up across the street in the parking lot and just kind of watched the business for a little while to see if anything happened." The detective did not see the Defendant come around the side of the building, so he decided to pull around the building to see if the Defendant was still standing on the side of the building.

As the detective drove toward the Mapco, he noticed the Defendant run out of the store and around the side of the building toward the parking lot of a dentist's office located on Due West Avenue. Detective Agoston followed the Defendant, and he radioed dispatch to find out if any calls had been received from the Mapco. He testified that dispatch informed him that a call had just been received from the Mapco, stating that a robbery occurred at the store. Detective Agoston saw the Defendant hop into the driver's seat of a white car, drive into another business's parking lot, and enter Due West Avenue. The detective followed the car and initiated a traffic stop.

The detective testified that the Defendant "pulled about halfway up [a] driveway and jumped out and started running through front yards." Detective Agoston chased the Defendant, followed him behind a house, and found him sitting next to a metal shed. The detective took the Defendant into custody and turned him over to another officer, Officer Andrew Ivey, to be transported back to the scene. Detective Agoston then retraced the steps of the foot pursuit to determine whether the Defendant dropped any evidence along the way. When the detective got back to Due West Avenue, he noticed that the Defendant's car was gone. A patrol officer later found the vehicle in a nearby parking lot.

After Detective Agoston retraced the pursuit route, he returned to the Mapco convenience store and learned that police officers had conducted a show-up identification. The detective interviewed the clerk working at the Mapco convenience store during the robbery, and the clerk confirmed that the Defendant was the robber. The clerk stated that the only difference was that the robber had long hair at the time of the robbery and the Defendant

now did not. Detective Agoston testified that a wig with a knit toboggan attached to it was found in the back seat of the vehicle the Defendant drove before being stopped by police.

At the hearing, Detective Agoston testified that he was familiar with the procedural order issued by his department regarding the guidelines for investigating a case, including the proper procedures for conducting a show-up identification. The order includes a guideline stating that a show-up identification should not be conducted if an officer has probable cause for an arrest.

Jonathan Colvin testified that he worked at the Mapco convenience store as a clerk on November 17, 2009. He noticed a man enter the store and act suspiciously. Colvin described the man as "waiting around, you know, sort of meandering in the store a little bit, waiting for a group of customers to leave." Once the group of customers left, the man came up to the register and demanded money. Colvin stated that, when the cash register jammed, the man became impatient, and he lifted up his shirt and exposed what appeared to be a .38 caliber handgun tucked into his pants. Colvin testified that the man then threatened him, saying "something to the [e]ffect of . . . do not make me use this or . . . hurry up do not make me use this." After the register opened, Colvin placed the money into a bag and handed it to the robber. The robber ran out of the store toward the side of the building along Due West Avenue. Colvin immediately called 911 and reported the robbery. Colvin described the robber as wearing a "dark hoodie" pulled over his head and covering his hair line, "mirrored chromed silver type glasses," and having long hair.

Colvin testified that, within 10-20 minutes of the robbery, police brought the Defendant to the Mapco convenience store in a marked police vehicle. Officers brought the Defendant to the edge of the backseat of the patrol car and asked Colvin to identify him. Colvin identified the Defendant as the man who had robbed him, "although his appearance had changed." Colvin described that the Defendant had "short cropped hair" when he identified him as the robber, and, at the time of the robbery, the robber had long, "braided sort of type" hair. Colvin, however, stated that he had "no doubt" that the Defendant was the robber. After Colvin's identification, officers confirmed to Colvin that the Defendant was the man they pursued and captured.

Officer Andrew Ivey, an officer with the Metro Nashville Police Department, testified he worked on November 17, 2009, and, during his shift, he transported the Defendant in his police car after the Defendant's arrest. He, however, could not recall conducting the show-up identification with Colvin at the Mapco convenience store.

After hearing the proof and considering the relevant authorities, the trial court ruled that the show-up identification was proper; therefore, it denied the Defendant's motion to

suppress the identification evidence. In denying the Defendant's motion to suppress the identification, the trial court made the following finding:

> I realize that there is a danger sometimes for a show-up to lead to [an] . . . irreparable misidentification, but I think that the case law would permit[,] even the cases cited by the [D]efendant[,] show-ups in certain circumstances . . . .

> [Detective Agoston] observes the [D]efendant at Mapco. It is raining. Apparently, he saw him come running out [of] the store after observing him a little earlier[.] [B]efore that[, he ran] toward the parking lot [on] Due West and he jumps into the car and takes off[.] [T]here is a call regarding a robbery and [Detective Agoston] chases this man. He gets out of the car and runs and he catches him near a shed, transported him back to the scene[,] which was within moments after this all happened[,] and apparently the man was identified in the police car.

> I recognize that if there was suggestiveness about it . . . then that would be an obvious problem, but I think in this case based on what I can hear about it from the testimony, the [Defendant] was there. Mr. Colvin has testified here that he was asked [if] this suspect was someone that you can identify without being told about all the details of it until after he identified him.

> . . . in this particular case[,] under the circumstances[,] the [D]efendant will be able to be viewed here in court and the identification of him at the scene by Mr. Colvin will be admitted . . . .

### B. At Trial

At the Defendant's trial, the following evidence was presented: Jonathan Colvin testified that he worked the night shift at the Mapco station and convenience store at the corner of Gallatin Pike and Due West Avenue. Colvin repeated much of the testimony given at the suppression hearing, stating that, in the early morning hours of November 17, 2009, he noticed a man enter the convenience store at the same time as a group of customers. The man "was kind of staying by himself and in an area where most customers would not gravitate and look at things for a long period of time." After the customers checked out, the man "promptly walked up to the cash register and ask[ed] for the money out of the cash register." When Colvin tried to open the cash register, it jammed and the man got a "little

-4-

more agitated." He lifted the left side of his shirt, exposing the handle of a gun and said, "Do not make me use this." Colvin testified that he recognized the gun as a .38 caliber handgun because he grew up in a military family and "knew a lot about personal firearms and things like that." Colvin testified that the robber wore dark pants, a "faded black kind of hoodie with his hood drawn over his face," glasses with a reflective silver finish, and his "hair was coming out of the bottom of the hoodie." After Colvin handed the robber the bag of money, the robber ran out of the store and around the building toward Due West Avenue. Colvin stated that he looked at the robber's face for between forty-five seconds and a minute before the robber left the store. Colvin immediately reported the robbery, and the police dispatcher informed him that police were already in pursuit of a suspect.

Soon after he reported the robbery, Colvin testified that a police officer brought the Defendant to the Mapco station parking lot in a marked police car. An officer had the Defendant move to the edge of the back seat of the car and asked Colvin to identify him. Colvin stated that he was "[p]ositive" that the Defendant was the same person who committed the robbery. He testified that the differences were that the Defendant "was in handcuffs . . .[,] and the . . . glasses were missing, the hoodie was pulled down, his hair was different[,] it was short and short cropped hair, so the longer hair . . . was the only thing different[,] but the facial features here were so strongly similar that I was . . . positive that was him."

Detective Byron Agoston testified that in the early morning hours of November 17, 2009, he conducted "general surveillance in the areas where we have burglaries of businesses and the like, particularly at this time on Gallatin [Pike]." Detective Agoston testified to the same information he provided at the motion hearing, stating that he noticed the Defendant standing on the uncovered side of the building as it started to rain. He watched the Defendant for a few minutes and testified that he had "just decided [to] drive by and if [the Defendant] was still standing on the side of the building, [he] would just stop and talk to him and see what he was up to and if need be get him to move along." At that time, the detective noticed the Defendant run out of the convenience store and into an adjacent dentist's office parking lot. He saw the Defendant jump into the driver's side of a car and drive onto the road. Detective Agoston confirmed with police dispatch that a call had been received from the Mapco store reporting a robbery and then activated his blue lights to initiate a traffic stop of the car. The car then pulled into a driveway, and the Defendant exited the vehicle and fled on foot through the front yards of houses on Due West Avenue. The detective remained in his vehicle and "drove parallel to him in the yards on the street." When the Defendant turned and ran into the backyards of the houses, the detective pulled into a driveway, jumped out of the vehicle, and pursued the Defendant through the backyards. Detective Agoston testified that he found the Defendant "leaning up against a metal shed in the backyard." He took the Defendant into custody and transferred custody of the Defendant to Officer Ivey, who took

the Defendant back to the Mapco.

After transferring custody of the Defendant, Detective Agoston noticed that the car used by the Defendant was gone from the location where the Defendant abandoned it. He realized that there must have been a second subject, and he "put out a description of the vehicle so that the other officers that were responding to the area could keep an eye out for it." Detective Agoston stated that, a few minutes later, Officer Waltz reported finding the car unoccupied and parked behind a bar on Due West Avenue. In the back seat of the car, officers found a wig attached to a knit toboggan and "a black plastic handle from [some] sort of tool" that had black electrical tape wrapped around it. Officers did not collect that evidence at that time because "it did not appear to have any relevance to the case." Detective Agoston did, however, recover the wig when the car was searched at the tow-in lot. The officers never recovered the money, the bag that held the money, sunglasses, or the gun. Although Detective Agoston retraced the pursuit route, he did not find any other evidence. Officers never apprehended the Defendant's accomplice.

Detective Agoston testified that he took the Defendant before a judicial commissioner, who explained the charge of aggravated robbery to the Defendant. In response to the judicial commissioner's statements, the Defendant said, "But I did not have a gun."

Officer George Bouton, an officer with the Metro Nashville Police Department, testified at trial that he responded to a robbery scene located at a Mapco Express at Gallatin Pike and Due West Avenue. He testified that he processed fingerprints from various areas of the store, including fingerprints from the main entrance and counter at the convenience store. Officer Bouton also recovered the black plastic handle found in the Defendant's escape car and turned it over to the property section of the police department.

Officer Andrew Ivey, an officer with the Metro Nashville Police Department, testified at trial that he responded to the robbery report at the Mapco Express on Gallatin Pike on November 17, 2009. When he arrived at the scene, he secured the station and convenience store for the investigation. He testified that no customers were allowed to enter the parking lot or store. He also testified that his recollection of the incident was a little vague because he was not the detective that handled the case. He recalled Detective Agoston transferred custody of the Defendant to him while Detective Agoston returned to the scene of the pursuit to search for evidence.

Defense counsel provided the testimony of Dr. Jeffery Neuschatz, a professor and associate chair of the Psychology Department at the University of Alabama in Huntsville, who testified as an expert in the field of eyewitness identification. He testified that he considers several factors when evaluating an eyewitness recollection, including the

-6-

following: environmental conditions, such as lighting and view; the observer's mental condition, such as the stress level of the observer; the time between when the observer saw the event and when the observer recalled the event, called "retention interval;" and the manner and methods for the retrieval of memories. Dr. Neuschatz testified that he reviewed the reports in this case and determined that Jonathan Colvin experienced a "high stress situation" as a result of the robbery. According to Dr. Neuschatz, the stress of the robbery, the tendency to focus on the weapon, the effect of the disguise worn during the robbery, and the cross-racial identification impaired Colvin's eyewitness identification.

Dr. Neuschatz also testified that the officers in this case failed to follow some of the procedural guidelines for conducting proper show-up identifications. Specifically, he testified that officers did not use "unbiased live instructions" to caution the witness that the person may or may not be the perpetrator and they did not create a police report that documented the description of the perpetrator prior to the show-up.

On cross-examination, Dr. Neuschatz testified that he based his opinion in this case on studies conducted by other individuals. He also testified that he did not interview Colvin about his identification and could not state whether Colvin's identification of the Defendant as the robber was right or wrong.

## II. Analysis

On appeal, the Defendant contends that: (1) the trial court erred in denying the Defendant's motion to suppress the show-up identification; (2) the evidence is insufficient to support the Defendant's conviction for facilitation of aggravated robbery; and (3) the trial court erred when it imposed the Defendant's sentence for facilitation of aggravated robbery.

### A. Suppression of the Show-Up Identification

The Defendant claims that the trial court erred when it denied his motion to suppress the show-up identification because the identification procedure was unduly suggestive, violating his right to due process. The State disagrees, arguing that the show-up identification of the Defendant was proper because it occurred as part of an on-the-scene investigation immediately after the crime occurred. We agree with the State.

A trial court's factual findings in a motion to suppress hearing are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Jones*, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Furthermore, questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of

fact." *Odom*, 928 S.W.2d at 23. The application of the law to the facts as determined by the trial court is a question of law that is reviewed *de novo* on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997).

"It has long been recognized that show-ups are inherently suggestive and unfair to the accused." *State v. Thomas*, 780 S.W.2d 379, 381 (Tenn. Crim. App. 1989). The United States Supreme Court has "widely condemned" the use of show-up identifications, along with other identification procedures, because of their suggestive nature. *Stovall v. Denno*, 388 U.S. 304, 302 (1967), *overruled on other grounds by Griffin v. Kentucky*, 479 U.S. 314 (1987). As a result, this Court has "repeatedly condemned" the use of show-up identifications unless "(a) there are imperative circumstances which necessitate a show-up, or (b) the show-up occurs as an on-the-scene investigatory procedure shortly after the commission of the crime." *Thomas*, 780 S.W.2d at 381. The determination, however, of "a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances." *Stovall*, 388 U.S. at 302. Thus, "each case must be considered on its own facts." *Simmons v. United States*, 390 U.S. 377, 384 (1968). A conviction based on a flawed identification procedure will be reversed only when the procedure utilized in the defendant's case "was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Id.*

Even if the identification procedure was unnecessarily suggestive, suppression of either an out-of-court or in-court identification is only required when the totality of the circumstances shows that the identification was unreliable, violating the due process rights of the defendant. *See Neil v. Biggers*, 409 U.S. 188, 198-99 (1972); *State v. Biggs*, 211 S.W.3d 744, 749 (Tenn. Crim. App. 2006). In *Biggers*, the United States Supreme Court set forth five factors to be considered when determining whether an identification is reliable: (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. *Biggers*, 409 U.S. at 199-200. Therefore, in the event that we conclude that the identification procedure was suggestive, only then must we determine whether, considering the totality of the circumstances, the identification was reliable despite the fact that it was inherently suggestive. *Biggers*, 409 U.S. at 199; *Biggs*, 211 S.W.3d at 749.

Based on the evidence presented, this Court does not find that the show-up identification conducted by the officers was unnecessarily suggestive. Therefore, analysis of the show-up identification through the "totality of the circumstances" test outlined by the United States Supreme Court in *Biggers* and this Court in *Biggs* is not required. The show-up identification occurred as part of the investigation, and officers conducted the

identification shortly after the commission of the robbery. Colvin testified at both the suppression hearing and at trial[1] that, while he worked behind the counter at the Mapco convenience store as a clerk, a man approached him, demanded money, and threatened him by showing him what appeared to be a gun tucked in the waistband of his pants. After Colvin handed the man the money, he saw the man run out the doors and toward Due West Avenue. Detective Agoston testified that he saw the Defendant run out of the Mapco convenience store, run through an adjacent parking lot, and jump into the driver's seat of a white car. The detective followed the car and initiated a traffic stop when he received confirmation that a robbery had been reported at the Mapco station. Detective Agoston then saw the Defendant pull over, exit the car, and run through the yards of nearby houses. The detective gave chase, caught the Defendant a few minutes later, and arrested him. The detective transferred custody to Officer Ivey, who transported the Defendant back to the Mapco station where Colvin identified him as the robber. Although Colvin testified that the man who robbed him had long hair, a hooded sweatshirt, and sunglasses, he was "positive" of his identification due to the strong similarity of the robber's facial features as compared to those of the Defendant. Further, Colvin testified that officers did not tell him details of the Defendant's capture until after Colvin made the identification.

As a result, the proof supports the trial court's finding that the show-up identification was not unnecessarily suggestive, and further supports the finding that it was valid because it took place soon after the robbery as part of an on-going investigation by police at the Mapco station. The Defendant is not entitled to relief on this issue.

### B. Sufficiency of the Evidence

The Defendant argues that the State presented insufficient evidence to support his conviction for facilitation to commit aggravated robbery as a lesser-included offense of aggravated robbery. Specifically, the Defendant contends that "[t]here is no evidence in the record, however, that the [D]efendant had knowledge of the robbery or that he substantially assisted the robber." The State argues that it presented the jury with evidence from which it could conclude that the Defendant assisted in the robbery.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State,

---

[1] In its review of the issue, this Court may consider the trial testimony of witnesses as well as the testimony of witnesses at the suppression hearing. *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998) ("[W]e hold that in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial.").

"*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "'A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State.'" *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate

inferences" which may be drawn from the evidence. *Goodwin*, 143 S .W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

The Tennessee Supreme Court recently reviewed the standard for sufficiency of the evidence in the context of a conviction for a lesser-included offense. *See State v. Parker*, 350 S.W.3d 883 (Tenn. 2011). In *Parker*, the defendant was indicted for first degree felony murder, but he was convicted of second degree murder, even though the proof in the record did not establish an essential element of second degree murder, that the defendant acted "knowingly" with respect to causing a fatal injury to the victim. *Id.* at 904. When reviewed by this Court, we relied on *State v. Mellons*, 557 S.W.2d 497 (1977), and concluded that, because the proof was sufficient to support the greater, indicted offense, the conviction for second degree murder "survive[d] despite the deficient proof of its elements." *Id.* at 905 (citation omitted); *see Mellons*, 557 S.W.2d at 499 (providing that "[o]n appeal, a conviction of a lesser included offense will be upheld, even if there is no evidence in the record to establish the technical elements of that crime, if the evidence demands a conviction of a higher degree of homicide than that found by the verdict . . . ."). The Tennessee Supreme Court, however, reversed the defendant's conviction, overruling *Mellons*, and held that "a court reviewing the sufficiency of the evidence must determine whether each element of the conviction offense is supported by sufficient proof." *Parker*, 350 S.W.3d at 909.

In the present case, the indictment charged the Defendant with aggravated robbery, and the trial court instructed the jury on all lesser-included offenses of aggravated robbery, including facilitation of aggravated robbery. Under Tennessee law, "[r]obbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a) (2010). As charged in this case, aggravated robbery is a robbery "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon; or [w]here the victim suffers serious bodily injury." T.C.A. § 39-13-402(a)(1)-(2) (2010). For facilitation of aggravated robbery, the defendant must have known the other person intended to commit the robbery; and, without intent to promote or assist in the commission of the robbery or benefit in the proceeds, "knowingly furnish[ ] substantial assistance in the commission" of the robbery. T.C.A. § 39-11-403(a) (2010).

Defense Counsel, on behalf of the Defendant, argues that "the jury's finding the [D]efendant guilty of facilitation of aggravated robbery rejected the victim's identification testimony, and, arguably, the detective's testimony as well," which demonstrated that the

Defendant lacked the intent to commit an aggravated robbery. The Defendant continues that no evidence exists in the record to support the jury's finding that the Defendant had knowledge of the robbery or that he substantially assisted the robber. The Defendant, however, does not cite the *Parker* case in his brief. The State counters that the Defendant's argument ignores the evidence presented that showed another person was involved and the reasonable inferences the jury could deduct from such proof. We agree with the State.

As an initial matter, this Court distinguishes the facts in *Parker* from those in this case. In *Parker*, the proof did not support one of the elements required to sustain a second degree murder conviction. Here, as outlined in detail below, the evidence is sufficient to support the jury's finding that the Defendant's actions satisfied the elements of facilitation of aggravated robbery, even if some of the proof presented is inconsistent with an element or elements of facilitation. Inconsistent evidence, which may be rejected by a jury, is not synonymous with insufficient, or a lack of, evidence of an element.

During the trial, Detective Agoston testified that he saw the Defendant run out of the Mapco store, run around the side of the building toward a parking lot, and jump into the driver's seat of a white car. The detective followed the car and initiated a traffic stop. The Defendant then jumped out of the car and ran through several yards. Detective Agoston gave chase, capturing the Defendant. The detective then transferred custody of the Defendant to another officer, and returned to the driveway where the chase began. He discovered that the car was gone. He stated that, a few minutes later, another officer reported finding the car unoccupied and parked behind a bar on Due West Avenue. In the back seat of the car, officers found a wig attached to a knit toboggan and "a black plastic handle from [some] sort of tool" that had black electrical tape wrapped around it. The detective testified that the officers never recovered the money, the bag that held the money, sunglasses, or the gun. As a result, this circumstantial evidence established the existence of an accomplice, who officers never apprehended. Based on such evidence and the fact that the Defendant did not have the stolen money, a reasonable jury could infer that the Defendant merely facilitated the robbery by acting at the direction of another individual who was never apprehended.

Further, Colvin, the Mapco store clerk, identified the Defendant as the robber, even though he acknowledged that his "appearance had changed." Colvin, however, stated that he was "[p]ositive" that the Defendant was the same person who committed the robbery. He testified that the differences were that the Defendant "was in handcuffs . . .[,] and the . . . glasses were missing, the hoodie was pulled down, his hair was different[,] it was short and short cropped hair, so the longer hair . . . was the only thing different[,] but the facial features here were so strongly similar . . . ." To counter Colvin's identification, the Defendant presented an expert in the field of eyewitness identification, who testified that Colvin's identification was compromised by the "high stress" of the situation and other factors.

-12-

Therefore, a rational jury certainly could have determined that Colvin was mistaken in his identification of the Defendant as the person who robbed him.

Considering the facts of this case, the jury heard proof that two people were involved in the robbery. The jury was free to conclude that the witnesses were incorrect to identify the Defendant as the one who entered the Mapco store. Furthermore, the jury could have concluded that the Defendant was in the passenger seat of the white car and, subsequently, ran from the car during the traffic stop, was caught by police, and was returned to the Mapco store to be misidentified by Colvin. If the jury had determined that the Defendant was not the person who entered the Mapco, but was in the small white car and later ran from that car at the traffic stop, that evidence is sufficient to satisfy each element of facilitation of aggravated robbery by another person who was not apprehended by police. This Court is not in the position to re-weigh or reevaluate the evidence. *See Matthews*, 805 S.W.2d at 779. Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence, including determinations of credibility. *See Buggs*, 995 S.W.2d at 105 and *Liakas*, 286 S.W.2d at 859. Therefore, affording the State of Tennessee the strongest legitimate view of the evidence contained in the record, we conclude that the proof satisfied the essential elements of the convicted offense. We conclude that the evidence presented at trial was sufficient to support the Defendant's conviction of facilitation of aggravated robbery.

The Defendant is not entitled to relief as to this issue.

### C. Sentencing

The Defendant contends that the trial court erred in imposing the maximum sentence for both of his convictions: concurrent terms of six years for the conviction for facilitation of aggravated robbery and eleven months and twenty-nine days for his conviction for evading arrest. Specifically, the Defendant argues that the maximum sentence imposed is not "the least severe measure necessary to achieve the purposes for which the sentence has been imposed," and it is "greater than that deserved for the offense(s) committed." *See* T.C.A. §§ 40-35-103(2), (4) (2010). During the sentencing hearing, the Defendant requested that the trial court "sentence [the Defendant] to the minimum possible of the three[-]year sentence with some sort of alternative sentence in place."

When a defendant challenges the length, range, or manner of service of a sentence, this Court must conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." T.C.A. § 40-35-401(d) (2010). As the Sentencing Commission Comments to this section note, the burden is now on the appealing party to show that the sentencing is improper. T.C.A. § 40-35-401 (2010), Sentencing Comm'n Cmts. This means that if the trial court followed the statutory

sentencing procedure, made findings of facts which are adequately supported in the record, and gave due consideration to the factors and principles relevant to sentencing under the 1989 Sentencing Act, Tennessee Code Annotated section 40-35-103 (2010), we may not disturb the sentence even if a different result was preferred. *State v. Ross*, 49 S.W.3d 833, 847 (Tenn. 2001).

In conducting a *de novo* review of a sentence, we must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210(b) (2010); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). We must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. T.C.A. § 40-35-103(5) (2010).

In this case, neither the State nor the Defendant offered evidence at the sentencing hearing, instead presenting only arguments. The Defendant, as a Range I standard offender, faced a potential sentence of three to six years for the facilitation of aggravated robbery conviction, a Class C felony. T.C.A. § 40-35-112(a)(3) (2010). The trial court sentenced the Defendant to six years, the top of the sentencing range. Regarding the evading arrest conviction, a Class A misdemeanor, the trial court sentenced the Defendant to eleven months and twenty nine days, requiring that the sentences be served concurrently for an effective six-year sentence. In its determination, the trial court found applicable enhancement factor (1), that the Defendant had a lengthy history of criminal convictions or criminal behavior in addition to those necessary to establish his range. *See* T.C.A. § 40-35-114(1) (2010). The trial court found that the Defendant had eight misdemeanor convictions between 2002 and 2009 for drug possession, theft, and driving offenses. In addition, in 2003, the Defendant had a conviction for grand larceny in Ft. Myers, Florida. The Defendant provided no mitigating circumstances, and the trial court did not find any applicable mitigating circumstances.

In its decision, the trial court stated that this "type of offense . . . is too much for this Court to look at as just a minor little situation." After weighing the circumstances of the case and the Defendant's criminal history, noting that the Defendant had a number of revoked licenses and numerous charges of theft, the trial court decided to sentence the Defendant at the high range of the sentencing category. The record reflects that the trial court considered

the seriousness of the offenses and also considered the Defendant's conduct when determining the sentence. After reviewing the Defendant's criminal history, the trial court noted that "[the Defendant] has now apparently moved into an area where he is going to try to get the money a little quicker than a theft and maybe a little more [money] than a theft." The trial court considered the dangerousness of the offense and expressed concern for the potential harm it could have caused to the store clerk and others in the area. As a result, we conclude that the trial court properly considered the sentencing principles when it sentenced the Defendant. The record reflects the trial court appropriately applied the applicable enhancement factor, and it did not err when it sentenced the Defendant to six years for his offenses. The Defendant is not entitled to relief on this issue.

### III. Conclusion

After a thorough review of the record and the applicable law, we affirm the judgments of the trial court.


_____
ROBERT W. WEDEMEYER, JUDGE